## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AIMEE HICKMAN, JARED HICKMAN, WILLIAM TREASURER, KELLY DROGOWSKI, FRANK DROGOWSKI, JOHN TAITANO, RICHARD PALERMO, LORI WOIWODE, SHAWN WOIWODE, CAROLYN PATOL, CASSANDRA SEMBER, AND STEVEN SEMBER, individually and on behalf of all others similarly situated, | Civil Action No. 1:21-CV-02100 |
| Plaintiffs, | FIRST AMENDED CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| SUBARU OF AMERICA, INC. and SUBARU CORPORATION f/k/a FUJI HEAVY INDUSTRIES, LTD. | |
| Defendants. | |

Plaintiffs Aimee and Jared Hickman, William Treasurer, and Kelly and Frank Drogowski, John Taitano, Richard Palermo, Lori and Shawn Woiwode, and Cassandra and Steven Sember ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2019 to present Subaru Ascent (the "Class Vehicles") against Subaru of America, Inc. ("SOA") and Subaru Corporation f/k/a Fuji Heavy Industries, Ltd. ("Subaru Corp.") (together, "Defendants" or "Subaru"). The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on the basis of an investigation by counsel.

**INTRODUCTION**

1. Defendants manufactured, marketed, distributed, and sold 2019 to present Subaru Ascent vehicles without disclosing the existence of a serious transmission defect that jeopardizes the safety of Class Vehicle drivers, passengers, and other drivers.

2. Prior to the production of the first Subaru Ascent, Subaru was already well aware of the problems with its TR690 transmission, a type of Continuously Variable Transmission ("CVT"), which it first began to use in its vehicles over a decade ago. Beginning in 2011, if not before, Defendants knew that the transmissions later installed in the Class Vehicles contain one or more defects in the design, workmanship, materials, and/or manufacturing of the transmission that causes hesitation, jerking, shuddering, lurching, squeaking, whining, or other loud noises, delays in acceleration, inconsistent shifting, stalling, and a loss of power or ability to accelerate at all. Discovery will show that these defects in design, materials, workmanship, and/or manufacturing in the transmission are caused by: 1) material and/or workmanship defects with transmission components, specifically the sensors for the hydraulic pressure system which determines the gear ratio, the CVT chain, and, the transmission wiring harness; 2) improper design and/or calibration of the software which controls the transmission's function, the Transmission Control Module (the "TCM"); 3) improper design and/or calibration of the transmission's features, including X-MODE, with other features of the vehicle, including Pre-Collision Throttle Management; and/or 4) design defects which did not properly account for the size, shape, and weight of the Ascent model compared to other

Subaru models which also use the TR690 ("Transmission Defect" or "Defect"). The Defect can damage the transmission itself, as well as affect the vehicle's alignment, putting unnecessary stress on the tires and brakes, causing premature wear and replacement, and in the most extreme cases, can even cause damage to the engine.

3.     The TR690 has long history of issues, often the result of material and workmanship defects, and Subaru has issued many service bulletins and service campaigns related to these defects.  The TR690 was originally designed for use in smaller, lighter cars.  Discovery will show that in their rush to put a full-size SUV onto the market, a car segment in which they previously had no vehicles, Defendants did not fully account for the differences in the shape, size, and weight of the Ascent. In fact, the build quality of the 2019 Ascent is so poor that it has been subject to 5 separate recalls, including a transmission recall.

4.     While Subaru touted the "re-designed" TR690 that was installed in Class Vehicles, discovery will show the redesign of the TR690 was extremely limited and mostly consisted of adding a feature called "X-MODE," described *infra*.

5.     The Transmission Defect presents a safety hazard because it severely affects the driver's ability to control the car's speed, acceleration, and deceleration. For example, it can be difficult for Class Vehicles to move smoothly through intersections and other commonplace driving situations such as entering and exiting highways, changing lanes, and even controlling speed on inclines and declines on the road.

6.     Defendants failed to disclose these material facts and safety concerns to purchasers and lessees of the Class Vehicles.

7.     The Class Vehicles share the same transmission, the TR690, and related components.

8.     One such complaint involving a 2020 Subaru Ascent was reported to the National Highway Transportation Safety Authority ("NHTSA") on December 13, 2020 as follows:

> 2800 MILES ON VEHICLE. TODAY LOST POWER TWICE GOING UP STEEP HILL (ELECTRICAL FUNCTIONS STILL INTACT, WAS ACCELERATING UPHILL AND WAS SIMILAR TO SHIFTING INTO NEUTRAL THEN RE-ACCELERATED AFTER 10-15 SECONDS, DRIVING APPROX 30MPH). NARROWLY AVOIDED COLLISION DUE TO SLIPPERY ROAD, DID BRIEFLY ROLL BACKWARDS BEFORE BRAKING. NOT SURE I WILL EVER BE WILLING TO PUT MY KIDS BACK IN THIS NEARLY-NEW VEHICLE.[1]

9.     Defendants knew the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of sale or lease and thereafter. Defendants have failed to disclose the true nature and extent of the Transmission Defect to Plaintiffs and the other Class Members, and actively concealed it from them, at the time of purchase or lease and thereafter. Had Plaintiffs and prospective Class Members known about the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

---

[1]https://www.nhtsa.gov/vehicle/2020/SUBARU/ASCENT/SUV/AWD#complaints (last accessed January 27, 2021).

10.     Despite notice of the Transmission Defect from, among other sources, pre-production testing, numerous consumer complaints, warranty data, and dealership repair orders, Defendants have not recalled all the Class Vehicles to repair the Defect, have not offered its customers a suitable repair or replacement free of charge, and have not offered to reimburse all Class Vehicle owners and leaseholders the costs they incurred relating to diagnosing and repairing the Transmission Defect.

11.     In fact, Subaru knew of and concealed the Transmission Defect that plagues every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiffs and the other Class Members both at the time of sale and repair and thereafter. As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

12.     Subaru, in fact, refuses to acknowledge the Defect exists.  In an effort to conceal the Defect, Subaru has instructed its corporate representatives and authorized dealers to say that the vehicles are functioning normally and their drivers are merely inexperienced with the feeling of CVT shifting or that the vehicles are "getting to know them" when owners or lessees who experienced the Defect complain.  Oftentimes, owners and lessees trade in or sell their Class Vehicles because they are afraid to drive them, but cannot afford to simply purchase another vehicle without selling their defective Class Vehicles.

## JURISDICTION AND VENUE

13.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiffs and many members of the Class are citizens of states different from Defendants' home state, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class and Classes.

14.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because SOA has its principal place of business and headquarters in this District; Subaru conducts substantial business in this District through SOA and significant conduct involving Defendants giving rise to the Complaint took place in this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, SOA has its principal place of business and regularly conducts business in this District, and SOA is a resident of this District under 28 U.S.C. § 1391(c)(2) and subject to personal jurisdiction in this District.

## PARTIES

### Plaintiffs Aimee and Jared Hickman

16.     Plaintiffs Aimee and Jared Hickman are citizens of and domiciled in the state of Maryland.  In or around June 2020, the Hickmans purchased a new 2020 Subaru Ascent from Heritage Subaru Owings Mills ("Heritage Subaru"), an authorized Subaru dealership located in Owings Mills, Maryland.

17.     The Hickmans purchased their vehicle primarily for personal, family, or household use.

18.     Passenger safety and reliability were primary factors in the Hickmans' decision to purchase their vehicle.   The Hickmans researched the Ascent on the internet, by "Googling" the vehicle and visiting Subaru's website, as well as that of the dealership.   They also reviewed the window sticker (the "Monroney" sticker), and test drove a 2020 Ascent prior to purchase.   Additionally, they spoke with the salesperson at Heritage Subaru, who told them that Subaru was "the most reliable brand on the road" and that more Subaru vehicles than any other brand were still on the road after ten years. Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

19.     Had Subaru disclosed the Transmission Defect before the Hickmans purchased their vehicle, the Hickmans would have seen such disclosures and been aware of them.   Indeed, Subaru's misstatements and omissions were material to the Hickmans.   Like all members of the Class, the Hickmans would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Transmission Defect.

20.     In addition, at the time the Hickmans purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru that they saw during their internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively.   The Hickmans relied on those representations, and the omission of a disclosure of the Transmission Defect, in purchasing the

vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

21.     In or around November 2020, Aimee Hickman felt her vehicle shudder as she drove up a hill and that the transmission was slipping.  At the same time, the engine would rev heavily.  This occurred repeatedly as she drove up hills, and occasionally her vehicle would lurch back and forth as well.

22.     Aimee Hickman has also experienced the shudder, slipping, lurching, and engine revving at lower speeds, and once, on the freeway.

23.     On or about January 27, 2021, with approximately 11,600 miles on the odometer, Aimee Hickman took her vehicle to Heritage Subaru and complained about the transmission.  The dealership informed her that there were no error codes and that there must be something wrong with way she drove the vehicle instead that caused the problem. No repairs were even attempted.

24.     The Hickmans continue to experience the slipping, lurching, and shuddering of the transmission in their vehicle, often on a daily basis because they live on a hill, and experience these symptoms of the Defect frequently.

25.     At all times, the Hickmans, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff William Treasurer**

26.     Plaintiff William Treasurer is a citizen of and domiciled in North Carolina.  On or around November 2, 2018, Treasurer purchased a new 2019 Subaru

Ascent from Prestige Subaru, an authorized Subaru dealership located in Asheville, North Carolina.

27.    Treasurer purchased his vehicle primarily for personal, family, or household use.

28.    Passenger safety and reliability were primary factors in Treasurer's decision to purchase his vehicle.  Treasurer researched the Ascent on the internet, by "Googling" the vehicle, and read an article about the Ascent.  He also reviewed the window sticker (the "Monroney" sticker) and test drove a 2019 Ascent prior to purchase.  Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

29.    Had Subaru disclosed the Transmission Defect before Treasurer purchased his vehicle, he would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to Treasurer.  Like all members of the Class, Treasurer would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Transmission Defect.

30.    In addition, at the time Treasurer purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Subaru that he saw during his internet research and heard in his conversations with the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively.   Treasurer relied on those representations, and the omission of a disclosure of the Transmission Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

31.    On or about July 31, 2020, Treasurer took his vehicle to Prestige Subaru so that multiple recalls could be performed, including a fuel pump replacement, a software update to the Engine Control Module ("ECM"), and a reprogramming of the TCM for his transmission.  The transmission recall also included a check for Diagnostic Trouble Codes ("DTCs") and a stall test of the transmission.  The vehicle did not have any codes and passed the stall test.

32.    On or about January 28, 2021, Treasurer was driving his vehicle when he stopped at a red light.  After the light turned green, he pressed the gas pedal and the engine revved, but the vehicle would not move.  The vehicle began to make strange noises and multiple warning lights illuminated on the dashboard.  Treasurer had to exit his vehicle at the intersection to direct traffic to go around his immobile vehicle.

33.    Treasurer's vehicle was towed by the American Automobile Association ("AAA") to Prestige Subaru.  Upon inspection, the dealership found "vehicle had several codes for transmissions, there was no movement from the vehicle when shifting into any gear."  Prestige Subaru performed a full transmission replacement in Treasurer's vehicle as a result.  At the time, the vehicle had approximately 24,900 miles on the odometer.

34.    At no time prior to the complete transmission failure in his vehicle did Treasurer note any problem with the vehicle or its transmission.  Moreover, Prestige Subaru performed the transmission recall on Treasurer's vehicle six months prior which including a DTC check and a stall test, which his vehicle apparently had passed.

35.     As a result of the Transmission Defect, Treasurer has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

36.     At all times, Treasurer, like all Class Members, has attempted to drive his vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Plaintiffs Kelly and Frank Drogowski**

37.     Plaintiffs Kelly and Frank Drogowski are citizens of and domiciled in the Commonwealth of Pennsylvania. On or around December 1, 2018, the Drogowskis purchased a new 2019 Subaru Ascent from Ciocca Subaru, an authorized Subaru dealership located in Allentown, Pennsylvania.

38.     The Drogowskis purchased their vehicle primarily for personal, family, or household use.

39.     Passenger safety and reliability were the primary factors in the Drogowskis' decision to purchase their vehicle.  The Drogowskis researched the Ascent on the internet, by "Googling" the vehicle, and reviewed comments on owners' forums and online reviews.  They also visited Subaru's website, as well as that of the dealership, review the window sticker (the "Monroney" sticker), and test drove the 2019 Ascent prior to purchase.  Additionally, they spoke with the salesperson at Ciocca Subaru, who repeatedly assured them that Subaru stood by the quality of its vehicles. Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

40.     Had Subaru disclosed the Transmission Defect before the Drogowskis purchased their vehicle, the Drogowskis would have seen such disclosures and been

aware of them.  Indeed, Subaru's misstatements and omissions were material to the Drogowskis.  Like all members of the Class, the Drogowskis would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Transmission Defect.

41.    In addition, at the time the Drogowskis purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru that they saw during their internet research and were told by the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively.  The Drogowskis relied on those representations, and the omission of a disclosure of the Transmission Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

42.    Shortly after they purchased the vehicle, they began to experience the vehicle pulling, shuddering, and hesitating, especially when trying to accelerate from a stop.  The issues were and still are particularly noticeable when they attempt to drive their Ascent up any kind of incline.

43.    The Drogowskis complained about the transmission problems in their vehicle to Ciocca Subaru when they took it in for service on or about July 17, 2019.  Although the dealership did not note their transmission complaint on their documents, they did perform a tire rotation and alignment.  At the time, the dealership noted that the vehicle had about 13,000 miles on the odometer but the front tires had worn down to 4/32 and the back tires had worn down to 3/32.  The Drogowskis paid about $100 for this service.

44.     Within ten days, on July 26, 2019, the Drogowskis returned their vehicle to Ciocca Subaru, again complaining about problems with the transmission. After being pressed, the dealership received approval from the Subaru District Parts and Service Manager ("DPSM") to replace all the tires on the vehicle, do a new alignment, and also perform a front and rear suspension alignment without cost to the Drogowskis.  The Drogowskis were explicitly told that this was not a warranty repair, but instead a gesture of "goodwill" on the part of Subaru.  The Drogowskis picked up their vehicle after these repairs on July 30, 2019.

45.     On September 28, 2019, the Drogowskis returned their vehicle to Ciocca Subaru, again complaining of transmission problems, including hesitation and squealing.  Additionally, despite the prior repair, the vehicle was still pulling to the right.  Upon inspection, which included "CVT Electrical Testing and Diagnosis", the dealership found that the squealing was from the chain in the CVT slipping and recommended a transmission replacement, including a transmission fluid flush.  As a result, the TR690 transmission in the vehicle was replaced with a new TR690 transmission.  The dealership also performed a new alignment of the vehicle and serviced the brakes by greasing the components.  The vehicle was returned to the Drogowskis on October 23, 2019, nearly a month later.

46.     This did not repair the Defect in their vehicle.  On December 14, 2019, the Drogowskis returned their vehicle to Ciocca Subaru and complained of a shudder in the transmission, as well as a pulling sensation while driving.  They asked specifically for the dealership to check the transmission again, because they felt that the issue may be due to the recall on the transmission and the replaced transmission.

The dealership "could not duplicate concern" and stated "no codes found" when they inspected for a CVT chain slip, as per the recall. However, the Transmission Control Module ("TCM") was reprogrammed.  The vehicle was returned to the Drogowskis on December 16, 2019.

47.     Despite these repairs, the Defect remained uncorrected in their vehicle. On July 7, 2020, the Drogowskis brought their vehicle back to Ciocca Subaru. Although still experiencing problems with the transmission, the dealership merely rotated the tires.  Ciocca Subaru also performed another recall on the vehicle, a fuel pump replacement.  The vehicle was returned to the Drogowskis on July 9, 2020.

48.     None of these repairs remedied the Defect in their vehicle.  To this day, the transmission in their 2019 Subaru Ascent shudders, jerks, pulls, hesitates, and struggles when they attempt to drive up hills, even though the vehicle has less than 25,000 miles on the odometer.

49.     Due to the Transmission Defect, the Drogowskis overpaid for a defective vehicle, have lost of the use of their vehicle while ineffectual repairs were made, and paid for ineffectual repairs.

50.     At all times, the Drogowskis, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff John Taitano**

51.     Plaintiff John Taitano is a citizen of and domiciled in California.  On or around August 28, 2019, Taitano purchased a new 2020 Subaru Ascent from Sierra

Subaru of Monrovia, an authorized Subaru dealership located in San Monrovia, California.

52.    Taitano purchased his vehicle primarily for personal, family, or household use.

53.    Passenger safety and reliability were primary factors in Taitano's decision to purchase his vehicle.  Taitano researched the Ascent on the internet by "Googling" the vehicle and visiting the Subaru website.  He also reviewed the window sticker (the "Monroney" sticker) and test drove a 2020 Ascent prior to purchase.  Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

54.    Had Subaru disclosed the Transmission Defect before Taitano purchased his vehicle, he would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to Taitano. Like all members of the Class, Taitano would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Transmission Defect.

55.    In addition, at the time Taitano purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Subaru that he saw during his internet research and was told by a salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively.  Taitano relied on those representations, and the omission of a disclosure of the Transmission Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

56.    In June 2020, when the vehicle's mileage was about 15,000 miles, Taitano experienced the vehicle having limited power while ascending hills, losing power while being driven, jerking at stop lights, and emitting a white cloud from the exhaust pipe.

57.    On or about July 21, 2020, when the vehicle's mileage was about 16,000 miles, Taitano took his vehicle to Subaru of San Bernardino and informed the dealership of the issues he had been experiencing.  The dealership returned the vehicle to Taitano without repairs and told him there was nothing wrong with the vehicle.

58.    On or about March 9, 2021, when the vehicle's mileage was about 22,000, Taitano took his vehicle to Subaru of San Bernardino and again complained about the transmission issues he experienced as well as the white smoke coming out of the exhaust pipe and the battery losing power frequently.  The dealership performed several tests, including a battery test which the vehicle passed, but told Taitano there was nothing wrong with the vehicle.

59.    On or about March 11, 2021, just two days later, Taitano brought his vehicle back to Subaru of San Bernardino and complained about the vehicle's battery dying overnight.  The dealership tested the battery again, and the battery failed.  The dealership replaced the battery.

60.    Since that time, Taitano's vehicle has continued to exhibit the Transmission Defect, including jerking, losing power, and seeing white smoke come from the exhaust pipe.

61.     As a result of the Transmission Defect, Taitano has lost confidence in the ability of the vehicle to ever provide safe and reliable transportation, which it currently cannot do.

62.     As a result of the Transmission Defect, Taitano is unable to rely on Subaru's advertising, despite wanting to purchase a Subaru vehicle in the future.

63.     At all times, Taitano, like all Class Members, has attempted to drive his vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Plaintiff Richard Palermo**

64.     Plaintiff Richard Palermo is a citizen of and domiciled in Massachusetts.  On or around December 2018, Palermo leased a new 2019 Subaru Ascent from Wakefield Subaru, an authorized Subaru dealership located in Wakefield, Massachusetts.

65.     Palermo leased his vehicle primarily for personal, family, or household use.

66.     Passenger safety and reliability were primary factors in Palermo's decision to lease his vehicle.  Palermo researched the Ascent on the internet, by "Googling" the vehicle, visiting the Subaru and dealership websites, and read owners' forums about Subaru Ascents.  He also reviewed the window sticker (the "Monroney" sticker) and test drove a 2019 Ascent prior to leasing.  Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

67.     Had Subaru disclosed the Transmission Defect before Palermo leased his vehicle, he would have seen such disclosures and been aware of them.  Indeed,

Subaru's misstatements and omissions were material to Palermo. Like all members of the Class, Palermo would not have leased his Class Vehicle, or would have paid less for the vehicle, had he known of the Transmission Defect.

68.    In addition, at the time Palermo leased his vehicle, and in leasing his vehicle, he relied upon representations from Subaru that he saw during his internet research and was told by the salesperson at the dealership that the vehicle had the highest safety rating in its class and was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively. Palermo relied on those representations, and the omission of a disclosure of the Transmission Defect, in leasing the vehicle, and absent these representations and omissions, would not have leased the vehicle or would have paid less for it.

69.    In or around December 2019, immediately after leasing his vehicle, Palermo experienced issues with the transmission in his vehicle, including the transmission jolting and the vehicle stuttering when driving up hills and seeming to lose power while being driven.

70.    On or around June 17, 2019, Palermo took his vehicle to Wakefield Subaru for a routine service appointment and complained about the transmission. The dealership informed him that there was nothing wrong with his vehicle and what he was experiencing was how the Continuously Variable Transmission ("CVT") in his vehicle operated.

71.    Palermo complained to Subaru of Wakefield several additional times and was repeatedly told there was nothing wrong with his vehicle.

72.     In or around August 2019, Palermo reached out to SOA via its customer service department concerning his transmission issues and was advised that either software updates or a transmission relearn would soon be available for his vehicle.

73.     On or around January 17, 2020, Palermo took his vehicle to Wakefield Subaru so that multiple recalls could be performed, including a fuel pump replacement, reprograming the transmission control unit to address a CVT chain slip, an ECU reprogramming C1424, and a software update to the Engine Control Module ("ECM").  However, these repairs failed to permanently remedy his transmission issues.

74.     Palermo continues to experience the jolting and stuttering of the transmission in his vehicle and experiences the symptoms of the Defect frequently.

75.     As a result of the Transmission Defect, Palermo has lost confidence in the ability of the vehicle to ever provide safe and reliable transportation, which it currently cannot do.

76.     At all times, Palermo, like all Class Members, has attempted to drive his vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Plaintiffs Lori and Shawn Woiwode**

77.     Plaintiffs Lori and Shawn Woiwode are citizens of and domiciled in the state of North Dakota.  On or around September 2, 2018, the Woiwodes leased a new a new 2019 Subaru Ascent from Kramer Subaru f/k/a Kupper Chevrolet Inc. d/b/a Kupper Subaru ("Kramer Subaru"), an authorized Subaru dealership located in Mandan, North Dakota.

78. The Woiwodes leased their vehicle primarily for personal, family, or household use.

79. Passenger safety and reliability were primary factors in the Woiwodes' decision to purchase their vehicle. Shawn Woiwode researched the Ascent on the internet, including researching it on Car and Driver magazine, Motor Trend website, and in Kelly Blue Book. They also reviewed the window sticker (the "Monroney" sticker), and test drove a 2019 Ascent prior to leasing. Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

80. Had Subaru disclosed the Transmission Defect before the Woiwodes leased their vehicle, the Woiwodes would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to the Woiwodes. Like all members of the Class, the Woiwodes would not have leased their Class Vehicle, or would have paid less for the vehicle, had they known of the Transmission Defect.

81. In addition, at the time the Woiwodes leased their vehicle, and in leasing their vehicle, they relied upon representations from Subaru that they saw during their internet research and were told by the salesperson at the authorized dealership that the vehicle was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively. The Woiwodes relied on those representations, and the omission of a disclosure of the Transmission Defect, in leasing the vehicle, and absent these representations and omissions, would not have leased the vehicle or would have paid less for it.

82.     In or around November 2018, shortly after leasing the vehicle, the Woiwodes began to experience the Defect, in that the transmission in their vehicle seemed to lose power while being driven, particularly when trying to accelerate to join highway traffic and once the vehicle reached approximately 19 miles per hour.

83.     On or around June 3, 2019, Mrs. Woiwode took her vehicle to Kramer Subaru for a routine service appointment and complained about the issues with her transmission.   She was informed that "Subaru was working on it." Plaintiffs continued to experience the Defect in their vehicle and drove the vehicle less as a result.

84.     On or about June 4, 2020, the Woiwodes' vehicle was serviced pursuant to a recall Subaru issued for their vehicle in December 2019, in which the transmission was inspected, several transmission codes were found, and the transmission control module was reprogrammed. However, this repair failed to permanently remedy the Defect.

85.     While the Woiwodes continue to complain to Kramer Subaru when they take their vehicle in for service, no further repairs have been attempted and they continue to experience hesitation and a loss of power when trying to drive their vehicle.

86.     At all times, the Woiwodes, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**<u>Plaintiff Carolyn Patol</u>**

87.    Plaintiff Carolyn Patol is a citizen of and domiciled in New York.  In or around January 2021, Patol purchased a certified pre-owned 2020 Subaru Ascent from Star Subaru, an authorized Subaru dealership located in Bayside Queens, New York.

88.    Patol purchased her vehicle primarily for personal, family, or household use.

89.    Passenger safety and reliability were primary factors in Patol's decision to purchase her vehicle.  Patol researched the Ascent on the internet by "Googling" the vehicle, researching safety crash ratings, and visiting the Insurance Institute for Highway Safety website.  Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

90.    Had Subaru disclosed the Transmission Defect before Patol purchased her vehicle, she would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to Patol.  Like all members of the Class, Patol would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Transmission Defect.

91.    In addition, at the time Patol purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Subaru that she saw during her internet research and was told by the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively.  Patol relied on those representations, and the omission of a disclosure of the Transmission Defect, in purchasing the vehicle, and absent these

representations and omissions, would not have purchased the vehicle or would have paid less for it.

92.     In or around January 2021, when the vehicle's mileage was about 7,000 miles and within a week of purchasing her vehicle, Patol experienced the vehicle jerking and a loud noise when shifting gears.  She also felt a tugging and jerking in the steering wheel when the vehicle went over 60 miles per hour.  Patol's vehicle also cannot park properly on an incline, even with the auto vehicle hold engaged.

93.     On or around February 10, 2021, Patol complained to her dealership about the transmission.  The dealership did not provide a diagnosis or tell Patol that there was anything wrong with her vehicle.

94.     On or around April 22, 2021, Patol complained to her dealership about the transmission.  The dealership waived off her complaint and told her she had nothing to worry about.

95.     As a result of the Transmission Defect, Patol has lost confidence in the ability of the vehicle to ever provide safe and reliable transportation, which it currently cannot do.

96.     At all times, Patol, like all Class Members, has attempted to drive her vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Plaintiffs Cassandra and Steven Sember**

97.     Plaintiffs Cassandra and Steven Sember are citizens of and domiciled in the Commonwealth of Virginia.  In or around October 2019, Steven Sember purchased a new 2020 Subaru Ascent from CMA's Colonial Subaru, an authorized

Subaru dealership located in South Chesterfield, Virginia, as a surprise for his wife, Cassandra Sember.

98.    The Sembers purchased their vehicle primarily for personal, family, or household use.

99.    Passenger safety and reliability were primary factors in the Sembers' decision to purchase their vehicle.  Steven Sember reviewed the window sticker (the "Monroney" sticker), and test drove a 2020 Ascent prior to purchase.  The salesperson also confirmed that it was a good, reliable vehicle.  Subaru could have and should have disclosed the Defect through each of these media and venues, but did not.

100.   Had Subaru disclosed the Transmission Defect before the Sembers purchased their vehicle, the Sembers would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to the Sembers.  Like all members of the Class, the Sembers would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Transmission Defect.

101.   In addition, at the time the Sembers purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru that they saw during their internet research and were told by the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the transmission operated correctly and effectively.  The Sembers relied on those representations, and the omission of a disclosure of the Transmission Defect, in purchasing the vehicle,

and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

102.   In or around January 2020, Mrs. Sember noticed the vehicle would lag and hesitate when she tried to accelerate.  The vehicle would also jerk and seem to lose power while being driven.

103.   On or around January 9, 2020, Mrs. Sember took her vehicle to CMA's Colonial Subaru for routine service and complained to the dealership that the transmission was slipping.  The dealership attempted a repair by performing a re-program of the Engine Control Module.  The repair attempt failed to remedy the Transmission Defect.

104.   On or around March 20, 2020, Mrs. Sember returned the vehicle to CMA's Colonial Subaru for routine service and complained that the transmission felt like it was pulling. No repairs were attempted and she was told the vehicle was fine.

105.   Mrs. Sember took her vehicle to CMA's Colonial Subaru on or about June 1, 2020, July 14, 2020, July 20, 2020, September 26, 2020, and January 12, 2021, complaining about the transmission's function and reporting that it seemed to lose power as she drove, failing to shift on time, and hesitating or feeling like it was pulling when she tried to accelerate from a stop. Each time, no repairs were performed to the transmission and she was told the transmission was behaving normally.

106.   Mrs. Sember continues to experience her vehicle lurching, hestitating, failing to shift, and losing power while being driven, and as a result, she is hesitant to drive the vehicle.

107.   At all times, the Sembers, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Defendants**

108.   Defendant Subaru Corporation f/k/a Fuji Heavy Industries Ltd.("Subaru Corp.") is a Japanese corporation located at The Subaru Building, 1-7-2 Nishishinjuku, Shinjuku-ku, Tokyo, 160-8316, Japan. Defendant Subaru Corp. is the parent company of SOA and is responsible for the design, manufacturing, distribution, marketing, sales and service of Subaru vehicles, including the Vehicles, around the world, including in the United States.

109.   Defendant SOA is incorporated in New Jersey and has its principal place of business and headquarters in Camden, New Jersey. It is there that SOA has a 250,000 square foot headquarters campus, wherein approximately 600 employees, including its officers, and the sales, marketing, and distribution departments, among others, are based and carry out the business of SOA. There also is an approximately 100,000 square foot national service training center for SOA adjacent to its headquarters campus, which houses service training, service engineering and product engineering functions. SOA markets and distributes automobiles throughout the United States and is a division of the Japanese conglomerate Subaru Corp.

110.   SOA is the U.S. sales and marketing subsidiary of Subaru Corp. and is a wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States. SOA has a nationwide dealership network and operates offices and facilities throughout the United States.

111.   In order to sell vehicles to the general public, SOA enters into agreements with dealerships who are then authorized to sell Subaru-branded vehicles to consumers such as Plaintiffs.  In return for the exclusive right to sell new Subaru vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties SOA provides directly to consumers. These contracts give SOA a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repairs at an authorized dealership are also completed according to SOA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents.  Per the agreements between SOA and the authorized dealers, consumers such as Plaintiffs can receive services under SOA's issued warranties at dealer locations that are convenient to them.

112.   SOA and Subaru Corp. also develop and disseminate the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotional materials relating to the Class Vehicles through the dealership network.  SOA is also responsible for the production and content of the information on the Monroney Stickers.

113. SOA is the designated liaison between Subaru Corp. and NHTSA for the purposes of reporting safety defects, including recalls, and for responding to NHTSA's requests, on behalf of the manufacturer, Subaru Corp.

114. Subaru Corp. and SOA (collectively "Subaru") have common management. Indeed, SOA's sales, marketing and distribution efforts in the United States are headed by corporate officers of Subaru Corp. For example, Takeshi Tacihmori, the chairman and CEO of SOA is also a Director and Corporate Executive Vice President for Subaru Corp. in charge of the Subaru Global Marketing Division, Subaru Japan Sales and Marketing Division and Subaru Overseas Sales and Marketing Divisions 1 and 2. The incoming Chairman of SOA is also a Corporate Senior Vice President of Subaru Corp. who is Chief General Manager of Subaru Overseas and the Vice President in charge of Sales and Marketing, Division 1.

115. Defendant Subaru Corp. communicates with Defendant SOA concerning virtually all aspects of the Subaru products it distributes within the United States.

116. Defendants manufactured, marketed, sold and warranted the Class Vehicles, including Plaintiffs' vehicle.

## FACTUAL ALLEGATIONS

117. For years, Subaru has designed, manufactured, distributed, sold, leased, and warranted the Class Vehicles. Subaru has marketed and sold over a hundred thousand of Class Vehicles throughout the United States, including through its nationwide network of authorized dealers and service providers.

118.   Subaru has thousands of authorized dealerships across the United States, all of which are under Subaru's control. Subaru authorizes these dealerships to sell Subaru vehicles, parts, and accessories and to service and repair Subaru vehicles using Subaru parts, and to perform warranty repairs on Subaru's behalf. Subaru's automotive sales through those dealerships for the United States for the fiscal year ending March 31, 2020 totaled 702,000 vehicles, or around 69% of its global automobile revenue of approximately $30.7 billion. Subaru sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including the Plaintiffs and Class Members, they purchase additional vehicle inventory from Subaru to replace the vehicles sold, increasing Subaru's revenues. Thus, Plaintiffs and Class Members' purchase of Class Vehicles accrues to the benefit of Subaru by increasing its revenues.

**I.      The Warranty**

119.   Subaru provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty (the "Warranty") with the purchase or lease of the Class Vehicles.

120.   The Warranty is consistent throughout the Class Period and across the Class Vehicles and provides a three-year/36,000-mile warranty for the Vehicles that expressly covers defects in materials or workmanship.

121.   Subaru represents as part of its Warranty terms that "Every owner of the vehicle during the warranty period shall be entitled to the benefits of these warranties." In other words, the Warranty remains with the Vehicle to the benefit of subsequent purchasers throughout the duration of the Warranty period.

122.   Subaru is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Subaru.  Consumers are not given a meaningful choice in the terms of the warranties provided by Subaru, and those warranties are offered on a "take it or leave it" basis.

123.   The warranties and representations contained in the Warranty were and are material to Plaintiffs because Plaintiffs would not have purchased the Class Vehicles or would not have paid as much as they did if they had known that Subaru would be unable to repair a serious safety defect like the Transmission Defect.

## II.   Subaru's Advertising Emphasizes Safety and Reliability

124. Defendants advertise and emphasize the safety benefits and innovativeness of their engineering group to consumers, specifically representing the following on Subaru's website:



125.   In fact, Subaru has built a loyal customer base by marketing itself as "More than a car company.™" As part of that image, Subaru emphasizes that it cares about its customers and is committed to their safety. Indeed, Subaru touts its

"industry-leading safety innovations" and represents to Plaintiffs and the class members on its website and elsewhere:



There's safe, and then there's
**SUBARU SAFE**

When you choose a Subaru, you're not just choosing a car. You're choosing a company with a lifetime commitment to protecting those you love. Learn more about our industry-leading safety innovations, and why Subaru is a leading choice among parents with teen drivers.

126.   Subaru emphasizes in its advertising that consumers should trust the company, should trust that its vehicles are reliable, and should know that Subaru is working for "a greater good." This is reflected on its website, wherein Subaru states:



As Kelley Blue Book's Most Trusted Brand for five years running[1], Subaru of America is committed to building vehicles our customers can rely on while being a part of a greater good.

127.   These promises are repeated in advertising for the Subaru Ascent, which was first offered for sale in late 2018 with 2019 model year vehicles. The brochure for the 2019 Subaru Ascent began with this promise:



Dream **bigger.**

When you're ready for life's next big adventure, the all-new 2019 Ascent™ is ready to take you to new heights. It's the largest and most versatile Subaru ever, with three rows and seating for up to eight.¹ It's packed with advanced technologies, from active safety systems to entertainment features. And you'll always drive with confidence, thanks to legendary Subaru quality, durability and reliability.

31

128.   The Subaru Ascent was the first seven passenger vehicle produced by Subaru.   A long-awaited addition to the Subaru line, the Ascent was meant to compete with the Honda Pilot, the Toyota Highlander, and the Hyundai Santa Fe. For years, Subaru had been losing customers to these manufacturers because it did not have a vehicle in the same class.

129.   As described in the brochure, the 2019 Subaru Ascent featured a "Lineartronic HCVT (High-Torque Continuously Variable Transmission) with Adaptive Control, Auto Vehicle Hold (AVH) and 8-speed manual mode with paddle shifters."  Among the features of this version of the TR690 was "X-MODE" which "optimizes engine output and transmission ratio" when necessary on low-friction surfaces.  The brochure promised that "you can reach even more more destinations" with the standard X-MODE.

130.   Subaru's Ascent brochure goes on to state that X-MODE "incorporates Hill Descent Control that helps maintain a constant vehicle speed when traveling downhill, enhancing vehicle control."

131.   The Ascent also includes "Pre-Collision Throttle Management," which Subaru describes as a system that "reduces power to your engine to help you avoid accidentally accelerating into the car in front of you while merging."

132.   These promises and descriptions are repeated in the brochures for the 2020 and 2021 Subaru Ascent and give the undeniable impression that Subaru Ascents have transmissions which provide a smooth driving experience and include active features which actually enhance the vehicle's safety.

133.   Similarly, in one commercial for the 2019 Subaru Ascent entitled "Dream Big", which Subaru caused to be displayed throughout American television markets, a family of four is seen driving through a foggy, wet forest on the way to a spectacular view.  Whether driving on the wet roads, or turning to drive off-road, the vehicle is seen to be driving smoothly and easily.



134.   In another commercial for the 2019 Ascent called "A Big Day Out," which Subaru caused to be displayed throughout American television markets, a grandmother enjoys a day with her family that makes her feel like a kid again, thanks to the roomy new SUV which drives smoothly and without incident on roads.

135.   In another commercial for the 2020 Ascent called "Features," which Subaru caused to be displayed throughout American television markets, various Ascents are seen driving through neighborhoods, on rural roads, and on a coastal road, without shuttering, jerking, or hesitating while accelerating.

136.   However, Subaru has made no disclosure in any of its advertisements that the Transmission Defect exists and that, due to the existence of the Defect, the Class Vehicles are, in fact, dangerous and unreliable in that they shudder, whine, hesitate, fail to accelerate when they should, and even lose power while being driven, which is contrary to Subaru's repeated representations.

## III.   The Transmission Defect

137.   Subaru is one of only a handful of automakers that use CVTs in its vehicles.  In fact, Subaru only uses CVTs in its current vehicles with automatic transmissions, which differ from a traditional automatic transmission in important ways.

138.   A traditional automatic transmission has a set number of gears and uses a hydraulic system to determine which gear, i.e. second, third, etc., is needed without direct input from a driver.  CVTs, on the other hand, do not have set gears.  Instead, they use pulleys, one of which connects to the engine to draw power and other which connects to the wheels.  The pulleys are connected to each other via a belt, or a chain.

139.   Subaru's Lineartronic CVT "uses two hydraulic operated adjustable pulleys with a chain link that connects them and utilizes a stepless gear ratio that allows the engine to run its optimal power range for improved fuel economy and

performance by continuously varying the gear ratio."[2]  Subaru represents that this provides a "smooth driving experience."[3]

140.   For Plaintiffs and members of the Class, however, the CVT in the Subaru Ascent does not live up to Subaru's promises of a "smooth driving experience."

141.   Discovery will show that the Transmission Defect is caused by one or more of the following problems with design, materials, workmanship, and/or manufacture:  1)  material  and/or  workmanship  defects  with  transmission components, including the sensors for the hydraulic pressure system which determines the gear ratio, the CVT chain, and, the transmission wiring harness; 2) improper design and/or calibration of the software which controls the transmission's function, the Transmission Control Module (the "TCM"); 3) improper design and/or calibration of the transmission's features, including X-MODE, with other features of the vehicle, including Pre-Collision Throttle Management; and 4) design defects which did not properly account for the size, shape, and weight of the Ascent model compared to other Subaru models which also use the TR690.

142.   The Transmission Defect presents a safety hazard that renders the Class Vehicles unreliable, unpredictable, and more likely to be involved in a collision or other serious incident.

---

[2] *See* "Subaru Lineartronic Continously Variable Transmission (CVT)", https://www.youtube.com/watch?v=a3PF4fPXe9U (published Oct. 30, 2013)
[3] *Id*.

143.   The Transmission Defect is dangerous, causing the Class Vehicles to shudder, whine, hesitate, fail to accelerate, and in extreme cases, lose power while driving, substantially increasing the risk of collisions.

## IV.   Subaru Had Superior and Exclusive Knowledge of the Transmission Defect

144.   Subaru has been designing, manufacturing, and distributing vehicles with the TR690 transmission for over a decade.   As described by one "Subaru Ambassador" in response to a complaint about the transmission on a Subaru run forum for the Ascent, "Our transmission is a solid, proven, TR690. The TR690 has been in service, in one form or another, for ten years (as of this month – happy 10 year birthday, TR690!!!) … It is a Subaru built and designed CVT."[4]

145.   However, the TR690 also has a long history of problems, of both design and manufacture, which Subaru has left mostly unaddressed.   Rather than fix the underlying problems with the TR690, Subaru instead has repeatedly issued Technical Service Bulletins ("TSBs") and other communications calling for total transmission replacements and issued warranty extensions specifically for the TR690.

146.   On or about July 24, 2009, Subaru issued SB-CF-18/19 to its dealerships, a service bulletin applicable to 2010 Legacy and Outbacks, which were equipped with the TR690.   The bulletin stated that "some vehicles equipped with the Lineartronic CVT may exhibit a lack of power concern in reverse when on a steep

---

[4] *See* May 7, 2019 post of Robert Mauro, Subaru Ambassabor available at https://www.ascentforums.com/threads/who-makes-ascent-transmission.5917/

incline. Under certain conditions, vehicles may not continue to reverse after the vehicle has been stopped while backing up an incline.  The concern is most prominent when the vehicle is at high operating temperatures."

147.   On November 26, 2012, Subaru issued TSB 16-85-12 regarding "CVT Secondary Pressure Sensor Diagnostics" for 2010-2012 Legacy and Outback models with the TR690 CVT.  In response to a "customer concern of a squealing-type sound during light throttle application," dealerships were directed to check the voltage on the TCM connector, and to the to the pressure sensor output.  "If the voltages are outside of the specified range [for the TCM connector], the TCM is damaged along with the pulley surfaces of the CVT due to chain slippage.  Replace both the TCM and CVT assembly."  If out of the specified range for the pressure sensor output, the CVT assembly should be replaced.  The TSB specifically cautioned to the dealerships to perform additional checks before ordering a new TCM or CVT, to rule out other wiring issues in the transmission.  A revised TSB issued on December 12, 2012 specifically required such other testing to be performed because a TCM or CVT replacement would be authorized.

148.   On January 6, 2014, Subaru issued TSB 16-90-13 applicable to 2010-2012 Legacy and Outbacks equipped with the TR690 CVT.  This TSB described the installation of new thruster washer as a countermeasure to the torque converter assembly to address complaints of very low engine RPM when coming to a stop, or stalling.  Specifically, the TSB stated "[t]he condition is similarly to coming to a stop in a manual transmission equipped vehicle without depressing the clutch pedal."  However, the TSB failed to state that such an occurrence in a manual transmission

vehicle causes the vehicle to stall.  The original thruster washer was found to have wear causing restriction of the oil passage used to bleed off lock-up clutch application pressure, resulting in either delayed or no lock-up pressure release.  This TSB was re-issued on May 7, 2014 and again on February 15, 2018, again to address stalling complaints.

149.   On October 21, 2014, Subaru re-issued TSB 03-67-12R, applicable to the 2010-2012 Legacy and Outback, informing its dealers that they are to install remanufactured CVTs into the vehicles that require major repair or overhaul of the transaxle.   The TSB directed that repairing the CVT was to be done only in delineated situations.

150.   On August 6, 2015, Subaru issued TSB 16-95-15, applicable to 2010-2012 Legacy and Outbacks with the CVT providing a new diagnosis procedure for CVT chain slip.  Customers may complaint of "abnormal transmission operating sounds, a shudder or vibration sensation, lack of power, hesitation, engine rpm rise without increase in vehicle speed or in isolated cases, a Check Engine Lamp illumination (with engine misfire DTCs stored in the ECM memory)."   With a confirmed chain slip, dealerships were directed to replace the transmission.  This TSB was later revised and reissued on December 20, 2016.

151.   On September 28, 2015, Subaru issued TSB 03-67-12R, in which it noted that remanufactured TR690 CVTs were available for 2014-2016 Foresters, 2012-2016 Crosstreks, and 2010-2016 Legacy and Outback vehicles.   The TSB noted that "retailers are required to use a remanufactured unit for all repairs

reimbursed by Subaru that require a major repair or replacement, except in the case of a new and in-stock vehicle."

152.   On July 11, 2016, Subaru issued TSB 16-102-16 to its dealerships.  This TSB applied to all models equipped with CVT transmissions.  It provided a new flow chart and further diagnostic tools for dealing with Diagnostic Trouble Code ("DTC") P0841: "Secondary Oil Pressure Sensor Performance."  One common complaint noted on the TSB was a "whining sound concern."  The TSB specifically stated, "a Technician may feel performing pressure checks before beginning the electrical checks may be a way to expedite diagnosis of an internal hard part failure requiring assembly replacement." Possible remedies, depending of the results of the diagnostics, included replacement of the secondary oil pressure sensor, the transmission wiring harness, the control valve assembly, the TCU, or even the entire transmission.

153.   On December 14, 2016, Subaru issued TSB 16-103-16, to warn of transmission fluid seepages in various models with the TR690 CVT, including 2010-2012 Legacy and Outback 2.5L models, 2013-2017 Legacy and Outback 3.6L models, 2014-2017 Forester Turbo models, and the 2015-2017 WRX.  This TSB addressed transmission fluid seepage from the CVT assembly.  The likely source of the seepage was the sealant on the CVT's oil pump chain cover.  The repair included removal, cleaning, and inspection of sealing surfaces followed by re-sealing the cover.  This TSB was revised and reissued on April 20, 2017.

154.   On February 23, 2017, Subaru issued TSB 16-104-17 to its dealerships. The TSB applied to 2010-2015 Legacy and Outbacks, and the 2015-2016 Crosstrek

Hybrids as a response to consumers complaining of a "bump feeling" from the CVT at Idle in drive.  The TSB directed dealerships to reprogram the TCM.

155.   On June 21, 2017, Subaru issued TSB 16-107-17 to its dealerships.  The TSB applied to 2010-2015 Legacy and Outbacks with 2.5L engines, the 2015 Legacy with the 3.6L engine, 2012-2015 Imprezas, 2013-2015 Crosstreks, 2014-2015 Crosstrek Hybrids, 2014-2015 Forester and Forester Turbos, and the 2015 WRX Turbo.  Specifically, the New Car Limited Powertrain Warranty of these vehicles was extended to 100,000 miles for these vehicles with the TR690.  Per the TSB, "[t]his change is not response to any specific condition."  This TSB was issued again on March 13, 2018.

156.   On October 9, 2018, Subaru issued TSB-16-117-18 to its dealerships.  The TSB applied to the 2018 Legacy, Outback, Impreza, Crosstrek, Forester and WRX vehicles.   Again, there was no repair specified, but instead, the New Car Limited Powertrain Warranty was extended to 100,000 miles for the TR690.  Per the TSB, "[t]he change is not in response to any specific condition."

157.   These TSBs for the TR690 show that Subaru was aware of similar malfunctions of the transmission in prior vehicles and years, and after being unable to fix the problem, simply extended the warranty.  In fact, Subaru has been criticized by several consumer groups, including the Center of Auto Safety, for failing to recall the TR690 and instead merely offering the warranty extension.[5]  "Why isn't this

---

[5] Jensen, Christopher, "Consumer Groups: Subaru Owners Deserve Transmission Recall, Not Extended Warranty," Forbes.com (Sept. 7, 2017) (last visited January 31, 2021).

being called a recall?" asked Jason Levine, executive direct of The Center for Auto Safety. The Director of Cars and Product Policy and Analysis for Consumers Union, a former top office at NHTSA said that offering an extended warranty was an admission by Subaru that there are problems with the transmission. "Debating over whether it is an unreasonable risk to safety to me raises the question, who are you putting first: your bottom line or your customer," said Friedman. Rosemary Shahan, the president of Consumers for Auto Reliability and Safety was also critical, saying that Subaru should be allowed to avoid a recall just to save money.[6]

158. Instead of issuing a recall for the TR690 in 2017, Subaru was instead already planning to install it in their newest vehicle, the Ascent.

159. On January 8, 2019, Subaru issued TSB 16-103-16R, a revision of an earlier December 14, 2016 TSB. The TSB directed dealerships to, "following a customer concern," inspect the sealant used on the CVT's oil pump chain cover and the input shaft oil seal. Dealerships were directed to re-seal the cover and replace the input shaft oil seal with a new, redesigned type. While the January 2019 TSB was applicable to various models "equipped with TR690 CVT," Subaru revised the TSB and re-issued it on August 29, 2019 to specifically add the 2019 and 2020 Subaru Ascent, as described below.

160. On June 19, 2019, Subaru issued TSB 16-122-19 for the 2019 Subaru Ascent. The TSB "provide[d] an updated procedure to follow when

---

[6] *Id.*

diagnosing/repairing a DTC P08042: 'TRANSMISSION FLUID PRESSURE SENSOR/SWITCH A CIRCUIT LOW.'"  The TSB directed dealerships to replace the transmission harness when the resistance was determined to be out of specification, a repair which otherwise did not appear in the service manual.

161.   On August 29, 2019, Subaru issued an update to TSB 16-103-16, which dealt with transmission fluid seepage.  Both 2019 and 2020 Ascents, among other vehicles, were added to the list of applicable vehicles.  In addition to the oil pump chain cover being identified as a source of the seepage, the input shaft oil seal was also identified.  The total repair now "involves chain cover removal, a thorough cleaning and inspection of the sealing surfaces followed by re-sealing the cover and replacement of the input shaft oil seal with the new, redesigned type."  Total repair time for Ascents is listed as over 4 hours of labor, in addition to costs for materials.  This TSB was again updated and re-issued on September 26, 2019, and December 1, 2020.

162.   On November 26, 2019, Subaru internally announced to its dealers only a recall of 76,842 2019 Ascents, which were the Ascents manufactured between February 22, 2018 and May 7, 2019, for CVT chain slip.  As described on the recall, "The CVT chain may slip resulting in irregular noise, vibration, hesitation while driving, and/or MIL illumination.  If driving under this condition continues, the vehicle may experience a loss of motive power, increasing the risk of a crash."

163.   On December 5, 2019, Subaru publicly announced the recall, adding further details.  In these Ascents, "mid-joint of the transmission hydraulic sensor harness was made with dissimilar materials (tinplate and copper) which may cause

an oxide film to form.  If an oxide film forms, the electrical resistance may increase, potentially causing an incorrect measurement of the hydraulic pressure.  If the fluid pressure is measured higher than its actual value, the Transmission Control Unit (TCU) programming was not robust enough to compensate for variation and would instruct the valve to lower the hydraulic pressure, thus potentially reducing the tension on the drive chain.  Customers may experience irregular noise and/or vibration while driving, and/or warning lamp illumination…Continuing to operate a vehicle experiencing this condition may ultimately result in loss of power while driving, increasing the risk of a crash."  Subaru directed its dealers to reprogram the TCU, test drive the vehicle, examine if certain DTC were present, and if so, replace the hydraulic sensor harness with an updated part.  If the vehicle experienced low drive chain tension, the transmission would be replaced.  However, the recall noted that replacement of either the transmission harness or the transmission would be "very rare."  This product campaign bulletin was revised on November 10, 2020.

164.  According to the chronology of this recall that Subaru submitted to NHTSA, **Subaru received the first technical report of hesitation during acceleration from the Canadian market in October 2018** in a 2019 Subaru Ascent.  By November 22, 2019, Subaru was aware of 241 unique dealer and non-dealer field reports.

165.  On April 2, 2020, Subaru issued TSB 16-128-20 for 2019 and 2020 Ascents.  The TSB directed that a new transmission harness should be installed in response to the technician finding that the transmission wiring harness is "NG" or not good after an inspection prompted by DTC P0842 – Transmission Fluid Pressure

Sensor / Switch "A" Circuit determines that the sensor itself is fine. The total repair time was nearly 6 hours. This TSB was updated on October 9, 2020, adding 2020 Legacy and Outbacks vehicles, and updated and re-issued again on January 26, 2021.

166.   On November 9, 2020, Subaru issued TSB 16-131-20, applicable to many vehicles with the TR690: 2010-2020 Legacy and Outback, 2012-2020 Impreza, 2012-2020 Crosstrek, 2013-2020 Forester, 2015-2020 WRX, and 2019-2020 Ascent.  Per Subaru, the bulletin "provides corrected diagnostic containing a revised flow for certain CVT solenoid related DTCs."  Eighteen different DTCs are listed, without explanation, and a complicated chart of diagnostic and possible repairs are outlined, including repairing the transmission harness, repair connectors, or replacing control valve body.  No specific customer complaints are noted on the TSB.

167.   On December 18, 2020, Subaru issued TSB 16-132-20, applicable to 2018-2021 Legacy and Outback, 2017-2021 Impreza, 2018-2021 Crosstrek, 2019-2021 Forester, and 2019-2021 Ascents.  This TSB "provides updated diagnostic procedures to follow when diagnosing an alleged Chain Slip condition on the TR580 and TR690 model CVT transmissions used in the models listed…In some cases, the customer may have had a concern of hearing an abnormal sound and / or felt an unusual vibration while driving.  This information is intended to provide Technicians a user-friendly procedure which will help to ensure an accurate diagnosis and reduce the possibility of unnecessary CVT replacements."   This highly technical TSB outlines various diagnostic procedures, and calls for in certain situations putting the

vehicle through "re-learning" procedures, replacing the TCM, or even full CVT assembly replacements.  This TSB was re-issued on December 29, 2020.

168.   On January 18, 2021, Subaru issued a revised version of TSB 16-132-20, which added a questionnaire which had to be filled out when diagnosing an alleged CVT chain slip condition on vehicles with the TR690, including the 2019-2021 Subaru Ascent.  This questionnaire asked about the "Frequency of Slip Condition", and offered several possible answers: "Only once," "A few times," "Intermittent," and "Always."  The questionnaire also asked "How Long Condition Been Occuring?" and offered several possible answers: "It just started," "Within the last month," and "From new."  It also asked for various possible "Symptoms" to be checked,  including  "Noise,"  "Vibration,"  "Shock/Bump,"  "Hesitation/Surge," "Shudder," "Jerking/Bucking," "Engine RPM rise/flare," "Lack of power / not accelerate," "Deceleration feeling, "Engine RPM not rise," and "Engine RPM fluctuation / hunting gear."  Possible repairs to be performed included replacing the entire transmission assembly, replacing parts, re-programming the TCM, performing a relearn procedure, or only making an inspection.  This TSB was subsequently revised and re-issued again on February 23, 2021, to specify that the questionnaire had to be completed prior to a repair and be submitted along with all technical testing data.  As noted with previous versions, the TSB specified that "[t]his information will be extremely helpful for SBR Engineers when analyzing what the customer was experiencing as Chain Slip. Cooperation with this special information request is greatly appreciated!"

169.   While Subaru touted that it had re-designed the TR690 for use in the Ascent, discovery will show that re-design was limited to adding additional features, such as X-MODE.   As a result, the underlying, well-known problems with the TR690 followed it into the Subaru Ascent.

170.   Complaints about the transmission's function, including hesitation, loss of power, shuddering, whining, and stalling soon appeared after the first vehicle models using the TR690 were sold.   Indeed, Subaru has acknowledged to NHTSA that it was first aware of reports from the public in October 2018.

171.   Federal law requires automakers like Subaru to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

172.   Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id*. Thus, Subaru knew or should have known of the many complaints about the Transmission Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Subaru to the Transmission Defect.

173.   Complaints filed by consumers with the NHTSA and other websites, which Subaru actively monitored during the relevant period, continue to accrue and

demonstrate that the Defect is a widespread, dangerous and unresolved problem. Attached hereto as **Exhibit A** are some of the complaints filed with the NHTSA for the Class Vehicles, which are available on the NHTSA's website, www.safercar.gov.[7] Attached hereto as **Exhibit B** is a sampling of complaints posted by consumers on third-party websites regarding the Defect in the Class Vehicles.

174. Many of the complaints reveal that Subaru, through its network of dealers and repair technicians, has been made aware of the Transmission Defect. In addition, the complaints indicate that despite having knowledge of the Transmission Defect, Subaru often refused to diagnose the defect, as with Plaintiffs, or otherwise attempt to repair it while Class Vehicles were still under warranty.

175. In addition to trying to convince consumers such as Plaintiffs that their driving was the problem, that they were not used to driving vehicles with CVTs, or that other systems may have been at fault, Subaru also actively and publicly dismissed reports of problems with the transmissions, like the postings of its Subaru Ambassadors on AscentForums.com.

176. However, Subaru had already begun to issue TSBs about the Subaru Ascent's TR690 by June of 2019.

177. Before Plaintiffs purchased their respective Class Vehicles, Defendants knew about the Transmission Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Defendants and

---

[7] At the time of the filing of this Complaint, NHTSA does not yet have an active listing for the 2021 Subaru Ascent. It is unknown at this time if NHTSA has received any reports of problems for this model.

their dealers, testing conducted in response to those consumer complaints, failure rates, the data demonstrating the high volume of complaints and repairs, and other aggregate data from Subaru dealers about the problem.

178.   Subaru is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Subaru conducts tests, including pre-sale durability, reliability, and safety testing, to verify the Class Vehicles and their components are free from defects and align with Subaru's specifications. Thus, Subaru knew or should have known the TR690 transmission was defective and prone to put drivers in a dangerous position due to the inherent risk of the Transmission Defect.

179.   In particular, Subaru's pre-production vehicle testing begins with testing at its proving grounds and test tracks at Bifuka Research and Experimentation Center in Hokkaido, Japan.  By late summer 2016, testing on the Subaru Ascent had progressed to road tests in California, as shown in the photograph below, with an expected production date in 2017 and sales beginning later that year for a model year 2018 Ascent.[8]

---

[8] Fink, Greg, "2018 Subaru Ascent Spied: Boxer Power with Three Rows," *Car and Driver*, Sept. 21, 2016.  (Available at https://www.caranddriver.com/news/a15099521/2018-subaru-ascent-spy-photos-news/) (last visited April 16, 2021).



180. In early 2017, further pre-production testing was performed in Michigan, as shown in the photograph below, with an eye towards sales later that year.[9] Instead, Subaru pushed back production of the Ascent, which did not begin until February 2018 with an on-sale date of late spring 2018 for model year 2019 Ascents.

---

[9] Gall, Jared, "2018 Subaru Ascent: Return of the Seven-Seat Subie," *Car and Driver*, Mar 27, 2017. (Available at https://www.caranddriver.com/features/a15096740/the-2018-subaru-ascent-is-a-car-worth-waiting-for-feature/) (last visited April 16, 2021).



181.   Despite the delays, and the design and/or manufacturing tweaks that occurred due to the transmission and/or other problems discovered during that pre-production testing, Subaru's internal quality control procedures were insufficient to prevent over 70,000 of the 2019 Subaru Ascent from being produced and distributed with potentially poorly made transmission hydraulic sensor harnesses which later necessitated a recall.   Discovery will show that Subaru Corp. manufactures the TR690 and that its internal quality control procedures are insufficient to detect significant defects in the materials used to manufacture the transmission.

182.   In fact, in the past few years, Subaru has recalled over 1 million cars for defects attributable to material or workmanship defects in its vehicles.   For example, on April 15, 2021, Subaru announced that over 466,000 2017-2019 Impreza and 2018-2019 Crosstrek vehicles would be recalled to replace degrading ignition coils.   At the same time, Subaru announced another 405,000 2019 Forester and Crosstrek vehicles would be recalled to examine and re-torque the bolts on the

rear stabilizer bar.  On April 16, 2020, Subaru also recalled 188,000 2019 Subaru Ascents, Imprezas, Legacies and Outbacks to replace faulty fuel pumps that could cause engine stalls in those vehicles. In October 2019, Subaru announced a recall of the same 466,000 2017-2019 Impreza and Crosstrek vehicles for faulty engine control modules. At least two other recalls identified other problems with manfacturing or workmanship defects in 2019 Subaru Ascents as well, including weak center support bolts that may come loose and cause the driveshaft to disconnect, and missing spot welds by the B-pillar, weakening the strength of the vehicle.  Similarly, over 2,000 2019 Legacy and Outback vehicles were recalled on June 26, 2019 for improperly applied spot welds on the duct below the cowl panel, which could weaken the strength of the vehicle. These recalls clearly suggest that Subaru has sub-standard quality control mechanisms to identify vehicle components that are not manufactured to specification prior to their installation in vehicles that are then sold to consumers. Subaru also suffers from significant deficits in quality control of the workmanship inside its component and vehicle assembly plants.

183.   Indeed, Subaru Corp. has produced and used the TR690 in its vehicles for over ten years.  In that time, Subaru has issued many TSB related to the same issues in its other vehicles that continue to plague the TR690 installed in the Subaru Ascent, namely, shuddering, whining, hesitation, stalling, and loss of power.

184.   In fact, Subaru is aware of many Subaru Ascents which have been subject to Lemon Law buybacks.  Indeed, many of the used 2019 Subaru Ascents

listed for sale on Edmunds.com note that these vehicles have a "lemon history."[10] In addition, Subaru is aware that many lessees of 2019 and 2020 Subaru Ascents have returned their vehicles to the dealerships due to dissatisfaction with the transmission.

185. Additionally, Defendants should have learned of this widespread defect from the sheer number of reports received from dealerships. Subaru interacts with individual dealerships to identify potential common defects and has received numerous reports regarding the Defect, as shown in the consumer complaints in Exhibits A and B. Subaru also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data. As a result, discovery will show that Subaru is aware of a significant number of Class Vehicles that are on their third transmission as a result of the Defect.

186. Subaru's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Subaru's policy that when a repair is made under warranty the dealership must provide Subaru with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information

---

[10] Available at https://www.edmunds.com/subaru/ascent/2019/.

to Subaru, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

187. Indeed, some of the complaints made to NHTSA and listed on internet forums state that the dealership contacted SOA regarding the transmission issues in their nearly new vehicles, such as the one listed below:

> On January 9, 2019, an incident dated December 31, 2018 involving a 2019 Ascent was reported as follows:
>
> OUR ASCENT STARTED HAVING A SQUEAL AND RPM JUMP AROUND 6000 MILES. THE CAR WOULD ONLY MAKES THE NOISE ON ACCELERATION AND WOULD CAUSE THE CAR TO LOCK UP UNTIL THE CHAIN/BELT WOULD RESEAT AND THE RPM RETURN TO NORMAL. IT THROWS NO WARNING CODES BUT HAPPEN RANDOMLY BUT SEVERAL TIMES WHEN IT DOES HAPPEN. WAS TOLD IT WAS A TRANSMISSION ISSUE, BUT SUBARU HAS REPLACED SOME AND THEY ARE DOING SAME THING. THEY TOLD ME TO DRIVE IT LIKE IT IS AND SERVICE DEPARTMENT WAS TO FILE A CLAIM WITH SUBARU TO TRY AND GET THEM TO INITIATE A FIX ROM THE SUBARU ENGINEERS. TOTALLY NOT SAFE TO DRIVE AT 65-70 AND THEN IT STALLS OUT BEFORE IT FIXES ITSELF.[11]

## V. Defendants Have Actively Concealed the Defect

188. Despite their knowledge of the Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Defendants failed to disclose to or actively

---

[11] https://www.nhtsa.gov/vehicle/2019/SUBARU/ASCENT/SUV/AWD#complaints

concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair, and thereafter:

    a) any and all known material defects or material nonconformities of the Class Vehicles, including the Transmission Defect;

    b) that the TR690 had a long history of problems, many of which are similar to the issues being experienced by Class Members in their Class Vehicles, including shuddering, vibration, whining noises, hesitation, stalling, and/or loss of power;

    c) that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

    d) that the Class Vehicles were defective, despite the fact that Subaru learned of the Transmission Defect before it placed the Class Vehicles in the stream of commerce.

189.  More troublingly, Subaru has limited the recall of Subaru Ascents to a subset of the Class Vehicles and refuses to acknowledge the issue in others. Moreover, that recall failed to remedy the Transmission Defect, as in the case of Plaintiff Treasurer, whose vehicle's transmission failed while being driven six months after being serviced for the recall.  Subaru also refuses to acknowledge ongoing complaints made as a result of the Transmission Defect even after a vehicle has received a replacement transmission, as in the case of Plaintiffs Kelly and Frank Drogowski.  Class Members are instead told that they are not used to driving with the CVT in their vehicles, that what they are experiencing is normal, and that Subaru should be trusted because it has years of experience with the TR690.

190.   Defendants have deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at their dealerships and/or be unable to drive their vehicles for long stretches of time while they are being constantly repaired.

191.   Moreover, when vehicles are brought to Defendants' dealers for repair, including under the recall, Class Members are provided with ineffective repairs in which one defective transmission is replaced with another defective transmission, as experienced by Plaintiffs. As a result, Class Members continue to experience the Transmission Defect despite having repairs, as shown by the experiences of Plaintiffs. Because many Class Members, like Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing), and diminution in value is not sufficient. A remedial scheme which also makes available a fix and/or warranty extension is necessary to make Class Members whole.

192.   Defendants have not recalled all the Class Vehicles to repair the Transmission Defect, have not offered to its customers a free suitable repair or free replacement of parts related to the Transmission Defect, under the recall or otherwise, and have not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Transmission Defect.

193.   Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

194.   As a result of the Transmission Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

195.   The existence of the Transmission Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Whether a vehicle's transmission can operate without shudders, whines, hesitation, stalling, and/or a loss of power, are material safety concerns. Had Plaintiffs and other Class Members known of the Transmission Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

196.   Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that Subaru will not sell or lease vehicles with known safety defects, such as the Transmission Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

197.  The Class Vehicles do not function as Subaru intended; no manufacturer intends for a vehicle to shudder, whine, hesitate, or lose power while being driven.

## VI.   Defendants Have Unjustly Retained A Substantial Benefit

198.   Plaintiffs allege that Defendants unlawfully failed to disclose the alleged Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

199.   Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

200.   As discussed above therefore, Plaintiffs allege that Defendants unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

201.   Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

## TOLLING OF STATUTES OF LIMITATIONS

202.   Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendants' deception with respect to the Defect. Defendants and their agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

203.   Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendants were concealing a defect and/or the Class Vehicles contained the Defect and the corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendants were concealing the Defect.

204. At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Defect in Class Vehicles.

205. Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendants' knowing, active, and affirmative concealment.

206. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

207. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

208. The Class and Sub-Classes are defined as:

**Class**: All persons or entities who purchased or leased a 2019 to present Subaru Ascent vehicle (Class Vehicle) in the United States.

**Maryland Sub-Class**: All persons or entities who purchased or leased their Class Vehicle in the State of Maryland.

**North Carolina Sub-Class**:  All persons or entities who purchased or leased their Class Vehicle in the State of North Carolina.

**Pennsylvania Sub-Class**:  All persons or entities who purchased or leased their Class Vehicle in the Commonwealth of Pennsylvania.

**California Sub-Class:**  All persons or entities who purchased or leased their Class Vehicle in the State of California.

**Song-Beverly Sub-Class:**  All persons or entities who purchased or leased new Class Vehicles in the State of California.

**Massachusetts Sub-Class:**  All persons or entities who purchased or leased their Class Vehicle in the Commonwealth of Massachusetts.

**North Dakota Sub-Class:**  All persons or entities who purchased or leased their Class Vehicle in the State of North Dakota.

**New York Sub-Class:**  All persons or entities who purchased or leased their Class Vehicle in the State of New York.

**Virginia Sub-Class:**  All persons or entities who purchased or leased their Class Vehicle in the Commonwealth of Virgnia.

209.   Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

210.   **Numerosity**:   Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is

significant enough, well over a hundred thousand, such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

211. **Typicality**: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing their Class Vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

212. **Commonality**: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include, *inter alia*:

   a) whether the Class Vehicles suffer from the Transmission Defect;

   b) whether the Transmission Defect constitutes an unreasonable safety hazard;

   c) whether Defendants know about the Transmission Defect and, if so, how long Defendants have known of the Defect;

   d) whether the defective nature of the Class Vehicles constitutes a material fact;

e) whether Defendants had and have a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and the other Class Members;

f) whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g) whether Defendants knew or reasonably should have known of the Transmission Defect contained in the Class Vehicles before they sold or leased them to Class Members; and

h) Whether Defendants breached the implied warranty of merchantability pursuant to state law and/or the UCC;

i) Whether Defendants breached their express warranties under state law and/or the UCC;

j) Whether Defendants violated the Maryland Consumer Protection Act;

k) Whether Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act;

l) Whether Defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

m) Whether Defendants are liable for fraudulent omission;

n) Whether Defendants violated the Song-Beverly Consumer Warranty Act;

o) Whether Defendants violated the California Consumer Legal Remedies Act;

p) Whether Defendants violated the California Unfair Competition Law;

q) Whether Defendants violated the Massachusetts Consumer Protection Act;

r) Whether Defendants violated the North Dakota Consumer Fraud Act;

s) Whether Defendants violated the New York General Business Law, § 349;

t) Whether Defendants violated the New York False Advertising Act; and

u) Whether Defendants violated the Virginia Consumer Protection Act;

213. **Adequate Representation**:   Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

214. **Predominance and Superiority**:  Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high

and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

<u>**COUNT I**</u>
**Breach of Express Warranty**
**(On Behalf of all Sub-Classes against SOA)**

215.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 214 as if fully set forth herein.

216.   Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf all Sub-Classes against SOA.

217.   SOA is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

218.   With respect to leases, SOA is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

219.   The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

220.   Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, SOA's express warranty is an express warranty under relevant state law.

221.   In a section entitled "What Is Covered," SOA's Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

222.   According to SOA, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

223.   The Warranty formed the basis of the bargain that was reached when Plaintiffs and other members of the Classes purchased or leased their Class Vehicles.

224.   SOA breached the express warranty through the acts and omissions described above.

225.   Plaintiffs and members of the Class have had sufficient direct dealing with either SOA or its agents (i.e., dealerships and technical support) to establish privity of contract between SOA, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are the intended third-party beneficiaries of contracts between SOA and its distributors and dealers, and specifically, of SOA's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

226.   Any attempt by SOA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because SOA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Plaintiffs and the members of the Class.  Among other things, Plaintiffs and members of the Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by SOA and unreasonable favored SOA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between SOA and members of the Class.

227.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the members of the Class whole, because SOA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

228.   Plaintiffs were not required to notify SOA of the breach because affording SOA a reasonable opportunity to cure its breach of written warranty would have been futile. SOA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

229.   Nonetheless, Plaintiffs provided notice to SOA of the breach of express warranties when they repeatedly took their vehicle to an authorized Subaru dealership and requested warranty repairs.   Further, Plaintiffs provided written notice by letters dated February 4, 2021 and February 5, 2021.

230.   As a result of SOA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

231.   As a result of SOA's breach of the express warranty, Plaintiffs and Class Members are entitled to legal and equitable relief against SOA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### (On Behalf of all Sub-Classes against All Defendants)

232.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 214 as if fully set forth herein.

233.   Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against all Defendants.

234.   Subaru is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

235.   With respect to leases, Subaru is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

236.   The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

237.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under the Uniform Commercial Code and relevant state law.

238.   Subaru knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Subaru directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiffs and members of the Classes bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs and members of the Classes, with no modification to the defective Class Vehicles.

239.   Subaru provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

240.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

241.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

242.   As a result of Subaru's breach of the applicable implied warranties, Plaintiffs and members of the Classes of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and members of the Classes were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

243.   Subaru's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

244.   Plaintiffs and members of the Classes have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

245.   Plaintiffs and members of the Classes were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members and through other internal sources.

246.   Nonetheless, Plaintiffs provided notice to Subaru of the breach of implied warranties when they repeatedly took their vehicle to an authorized Subaru dealership and requested warranty repairs.   Further, Plaintiffs provided written notice by letters dated February 4, 2021 and February 5, 2021.

247.   As a direct and proximate cause of Subaru's breach, Plaintiffs and members of the Classes suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs and members of the Classes have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

248.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

<u>**COUNT III**</u>
**Violation of the Maryland Consumer Protection Act**
**Md. Code Ann., Com. Law § 13-101, *et seq.***
**(On Behalf of the Maryland Sub-Class against All Defendants)**

249.   Plaintiff Aimee and Jared Hickman repeat and re-allege each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

250.   Plaintiffs Aimee and Jared Hickman ("Maryland Plaintiffs") bring this cause of action on behalf of themselves and the Maryland Sub-Class against all Defendants.

251.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale

or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302.

252.  Defendants, Maryland Plaintiffs, and members of the Maryland Sub-Class are "persons" within the meaning of Med. Code Ann., Com. Law § 13-101(h).

253.  In the course of Defendants' business, they willfully failed to disclose and actively concealed that: (1) the Transmission Defect exists in Class Vehicles; (2) the Transmission Defect can cause the Class Vehicles to hesitate, lurch, shudder, make loud noises, fail to accelerate, or loss power during driving; (3) that the Transmission Defect can damage the transmission and/or other components of the vehicle; and (4) that Defendants may refuse to or fail to provide remedies which permanently repair the Transmission Defect despite the terms of the warranty. Particularly in light of Subaru's representations about the safety, reliability, and smooth driving experience provided by its transmissions, in its national advertising campaigns and in the brochures for the Class Vehicles', a reasonable consumer would expect the Class Vehicles to operate without a known safety hazard which interferes with the proper function of the transmission.  Accordingly, Defendants

engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. Defendants' acts had the capacity, tendency, or effect of deceiving or misleading consumers. Defendants also failed to state a material fact that deceives or tends to deceives, and which constitutes deception, fraud, false pretense, false promise, misrepresentations, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

254. In purchasing or leasing the Class Vehicles, Maryland Plaintiffs and other members of the Maryland Sub-Class were deceived by Defendants' failure to disclose the Transmission Defect which causes the vehicles to hesitate, lurch, shudder, make loud noises, fail to accelerate, or loss power during driving. Defendants also willfully failed to disclose and actively concealed the Transmission Defect even when Maryland Plaintiffs and members of the Maryland Sub-Class took their vehicles to Subaru authorized dealerships for repair.

255. Maryland Plaintiffs and members of the Maryland Sub-Class reasonably relied upon Defendants' misrepresentations and omissions and had no way of knowing that said representations and omissions were false and gravely misleading. As alleged herein, Subaru engaged in sophisticated methods of deception. Maryland Plaintiffs and members of the Maryland Sub-Class did not, and could not, unravel Defendants' deception on their own, as Subaru engaged in a deliberately misleading campaign to describe and acknowledge the whole truth of the Transmission Defect in its TSBs and warranty extensions, and contend that the

symptoms of the Transmission Defect are "normal" for CVT operations.  Maryland Plaintiffs and members of the Maryland Sub-Class were not aware of the Transmissions Defect prior to the purchase or lease of their vehicles.

256.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

257.   Defendants' methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

258.   Defendants intentionally and knowing misrepresented and omitted material facts regarding the Class Vehicles and the Transmission Defect with the intent to mislead Maryland Plaintiffs and members of the Maryland Sub-Class.

259.   Defendants knew or should have known that their conduct violated the Maryland CPA.

260.   Defendants owed Maryland Plaintiffs and members of the Maryland Sub-Class a duty to disclose the truth regarding the Transmission Defect because the Defect affect the safety of the vehicles and they  have a duty to disclose safety defects under the Motor Vehicle Safety Act.  *See* 49 U.S.C. § 30018(c) ("A manufacturer of a motor vehicle or replacement equipment shall notify … the owners, purchasers, and dealers of the vehicle or equipment" if "the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety.") Defendants had a further duty to disclose because they:

     a)  Possessed superior and/or exclusive knowledge of the Transmission Defect in Class Vehicles;

b) Made incomplete representations regarding the safety, reliability, durability, and functionality of the transmissions within the Class Vehicles, while purposefully withholding material facts from Maryland Plaintiffs and members of the Maryland Sub-Class that contradicted these representations; and/or

c) Intentionally concealed the Transmission Defect from Maryland Plaintiffs and members of the Maryland Sub-Class.

261.  Defendants' conduct proximately caused injuries to Maryland Plaintiffs and the members of the Maryland Sub-Class.  Maryland Plaintiffs and members of the Maryland Sub-Class are reasonable consumers who not expect that the transmissions installed in their vehicles to exhibit problems such as to hesitation, lurching, shuddering, making loud noises, failing to accelerate, or losing power during driving.  This is a reasonable and objective consumer expectation relating to vehicle transmissions.

262.  Maryland Plaintiffs and the members of the Maryland Sub-Class were injured and suffered ascertainable losses, injury in fact, and/or actual damages as a proximate result of Defendants' conduct in that Maryland Plaintiffs and members of the Maryland Sub-Class overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequent of Defendants' misrepresentations and omissions.

263.  Defendants' violations present a continuing risk to Maryland Plaintiffs and members of the Maryland Sub-Class as well as to the general public.

Defendants' unlawful acts and practices complained of herein affect the public interest.

264.   Pursuant to Md. Code Ann., Com. Law § 13-408, Maryland Plaintiffs and members of the Maryland Sub-Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

265.   Plaintiff Hickman and the members of the Maryland Sub-Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct.

## COUNT IVV
### Violation of the North Carolina Unfair and Deceptive Acts and Practices Act
### (N.C. GEN. STAT. § 75-1.1, *et seq.*)
### (On Behalf of the North Carolina Sub-Class against All Defendants)

266.   Plaintiff William Treasurer repeats and re-alleges each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

267.   Plaintiff William Treasurer ("North Carolina Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the North Carolina Sub-Class against all Defendants.

268.   Defendants engaged in "commerce"  within the meaning of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. GEN. STAT. § 75-1.1(b).

269.   The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a). Defendants willfully committed unfair or deceptive acts or practices in violation of North Carolina UDTPA.

270.   Subaru participated in deceptive trade practices that violated the North Carolina UDTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

271.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

272.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

273.   Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

274.   Subaru knew or should have known that its conduct violated the North Carolina UDTPA.

275.  Defendants were under a duty to North Carolina Plaintiff and the North Carolina Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c)  Defendants actively concealed the defective nature of the Class Vehicles from North Carolina Plaintiff and the North Carolina Sub-Class Members at the time of sale and thereafter.

276.  By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

277.  The facts concealed or not disclosed by Defendants to North Carolina Plaintiff and the North Carolina Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle lurches, hesitates, shudders, makes noises, fails to accelerate and/or loses power are material safety concerns. Had North Carolina Plaintiff and the North Carolina Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

278.   North Carolina Plaintiff and the North Carolina Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

279.   As a result of Defendants' misconduct, North Carolina Plaintiff and the North Carolina Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

280.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, North Carolina Plaintiff and the North Carolina Sub-Class Members have suffered and will continue to suffer actual damages.

281.   North Carolina Plaintiffs and the North Carolina Sub-Class Members seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the North Carolina UDTPA, as well as an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the North Carolina UTPA, N.C. GEN. STAT. § 75-16.

## COUNT V
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 P.S. §§ 201-1, *et seq.***
**(On Behalf of the Pennsylvania Sub-Class against All Defendants)**

282.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

283.   Plaintiffs Kelly and Frank Drogowski ("Pennsylvania Plaintiffs") bring this cause of action on behalf of themselves and on behalf of the members of the Pennsylvania Sub-Class.

284.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

285.   All of the acts complained of herein were perpetrated by Subaru in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

286.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

287.   As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

288.  Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

289.  Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

290.  Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

291.  Subaru knew or should have known that its conduct violated the Pennsylvania CPL.

292.  Defendants were under a duty to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Defendants actively concealed the defective nature of the Class Vehicles from Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members at the time of sale and thereafter.

293.  By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

294.  The facts concealed or not disclosed by Defendants to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle hesitates, lurches, shudders, makes loud noises, fails to accelerate, or loses power while being driven are material safety concerns. Had Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

295.  Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

296.  As a result of Defendants' misconduct, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

297.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have suffered and will continue to suffer actual damages.

298.   Subaru is liable to Pennsylvania Plaintiffs and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 Pa. Cons. Stat. § 201-9.2(a).  Plaintiff and the Pennsylvania Sub-Class are also entitled to an award of punitive damages given that Subaru's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT VI
**Fraud by Omission or Fraudulent Concealment
(On behalf of the Class, or in the Alternative,
on Behalf of all Sub-Classes against All Defendants)**

299.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

300.   Plaintiffs bring this cause of action on behalf of themselves and the nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes, against all Defendants.

301.   Subaru knew that the Class Vehicles suffered from an inherent Transmission Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

302.   Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

303.   Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

a)  Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b)  The omitted facts were material because they directly impact the safety of the Class Vehicles;

c)  Defendants knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

d)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e)  Defendants actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

304.   The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Whether a vehicle hesitates, lurches, jerks, shudders, makes noises, fails to accelerate, and loses power, are material safety concerns. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

305.   Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs

and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendants' defective Class Vehicles.

306.   Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

307.   As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the Defective Vehicles and recover damages.

308.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VII
### Violation of the Song-Beverly Consumer Warranty Act
CAL. CIV. CODE §§ 1792 AND 1791.1, ET SEQ.
### (On Behalf of the Song-Beverly Sub-Class against All Defendants)

309.   Plaintiff John Taitano repeats and re-alleges each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

310.   Plaintiff John Taitano ("California Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Song-Beverly Sub-Class.

311.   California Plaintiff and the Song-Beverly Sub-Class members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

312.   Subaru is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

313.   The Class Vehicles are and were at all relevant times "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

314.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

315.   California Plaintiff and members of the Song-Beverly Sub-Class purchased or leased the Class Vehicles manufactured by Defendants.  Subaru knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Subaru directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom California Plaintiff and members of the Song-Beverly Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiff and members of the Song-Beverly Sub-Class, with no modification to the defective Class Vehicles.

316.   Subaru provided California Plaintiff and members of the Song-Beverly Sub-Class with an implied warranty that the Class Vehicles and their components

and parts are merchantable and fit for the ordinary purposes for which they were sold.

317. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

     a)  Pass without objection in the trade under the contract description.

     b)  Are fit for the ordinary purposes for which such goods are used.

     c)  Are adequately contained, packaged, and labeled.

     d)  Conform to the promises or affirmations of fact made on the container or label.

318. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

319. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiff and Song-Beverly Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

320. Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the

bargain. Accordingly, SOA's express warranty is an express warranty under relevant state law.

321.   In a section entitled "What Is Covered," SOA's Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

322.   According to SOA, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

323.   The Warranty formed the basis of the bargain that was reached when California Plaintiff and other members of the Song-Beverly Sub-Class purchased or leased their Class Vehicles.

324.   SOA breached the express warranty through the acts and omissions described above.

325.   As a result of Subaru's breach of the applicable warranties, California Plaintiff and members of the Song-Beverly Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiff and members of the Song-Beverly Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

326.   Subaru's actions, as complained of herein, breached the express warranty and implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

327. California Plaintiff and members of the Song-Beverly Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

328. California Plaintiff and members of the Song-Beverly Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the Defect from the complaints and service requests it received from California Plaintiff and the Song-Beverly Sub-Class Members and through other internal sources.

329. Nonetheless, Plaintiffs provided notice to Subaru of the breach of warranties when they repeatedly took their vehicle to an authorized Subaru dealership and requested warranty repairs.  Further, California Plaintiff provided written notice by letter dated February 15, 2021.

330. As a direct and proximate cause of Subaru's breach, California Plaintiff and members of the Song-Beverly Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, California Plaintiff and members of the Song-Beverly Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

331.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, California Plaintiff and members of the Song-Beverly Sub-Class have been damaged in an amount to be proven at trial.

**COUNT VIII**
**Violation of the California Consumer Legal Remedies Act**
**CAL. CIV. CODE § 1750, *ET SEQ***
**(On Behalf of the California Sub-Class against All Defendants)**

332.   Plaintiff John Taitano repeats and re-alleges each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

333.   Plaintiff John Taitano (California Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the California Sub-Class.

334.   California Plaintiff and the California Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

335.   Defendants are "persons" as defined by California Code § 1761(c).

336.   By failing to disclose and concealing the defective nature of the transmission from California Plaintiff and California Sub-Class members, Subaru violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their transmission had characteristics and benefits that they do not have and represented that the Class Vehicles and their transmissions were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

337.   In the course of Defendants' business, they willfully failed to disclose and actively concealed that: (1) the Transmission Defect exists in Class Vehicles;

(2) the Transmission Defect can cause the Class Vehicles to hesitate, lurch, shudder, make loud noises, fail to accelerate, or loss power during driving; (3) that the Transmission Defect can damage the transmission and/or other components of the vehicle; and (4) that Defendants may refuse to or fail to provide remedies which permanently repair the Transmission Defect despite the terms of the warranty. Particularly in light of Subaru's representations about the safety, reliability, and smooth driving experience provided by its transmissions, in its national advertising campaigns and in the brochures for the Class Vehicles', a reasonable consumer would expect the Class Vehicles to operate without a known safety hazard which interferes with the proper function of the transmission.  Accordingly, Defendants engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. Defendants' acts had the capacity, tendency, or effect of deceiving or misleading consumers.  Defendants also failed to state a material fact that deceives or tends to deceives, and which constitutes deception, fraud, false pretense, false promise, misrepresentations, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

338.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

339.    Subaru knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

340.    Because of their reliance on Subaru's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiff, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Transmission Defect, California Plaintiff and California Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are defective.

341.    Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

342.    Defendants were under a duty to California Plaintiff and the California Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a) Possessed superior and/or exclusive knowledge of the Transmission Defect in Class Vehicles;

   b) Made incomplete representations regarding the safety, reliability, durability, and functionality of the transmissions within the Class Vehicles, while purposefully withholding material facts from California Plaintiff and members of the California Sub-Class that contradicted these representations; and/or

   c) Intentionally concealed the Transmission Defect from California Plaintiff and members of the California Sub-Class.

343.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

344.    The facts concealed or not disclosed by Defendants to California Plaintiff and the California Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle lurches, hesitates, shudders, makes noises, fails to accelerate and/or loses power are material safety concerns. Had California Plaintiff and the California Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

345.    California Plaintiff and the California Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

346.    As a result of Defendants' misconduct, California Plaintiff and the California Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

347.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, California Plaintiff and the California Sub-Class Members have suffered and will continue to suffer actual damages.

348.   Subaru's violations present a continuing risk to California Plaintiff and the California Sub-Class Members as well as to the general public.   Subaru's unlawful acts and practices complained of herein affect the public interest.

349.   California Plaintiff provided Subaru with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) written notice by letter dated February 15, 2021. Throughout the course of this litigation and continuing at present, Subaru has failed to provide appropriate relief for its violations, including its violations of the CLRA. Therefore, California Plaintiff seeks monetary, compensatory, and punitive damages.

## COUNT IX
### Violation of the California Bus. & Prof. Code § 17200, *ET SEQ*
### (On Behalf of the California Sub-Class against All Defendants)

350.   Plaintiff John Taitano repeats and re-alleges each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

351.   Plaintiff John Taitano (California Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the California Sub-Class.

352.   As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, California Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

353. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

354. California Plaintiff and the California Sub-Class Members are reasonable consumers who do not expect that their transmissions will be defective.

355. Defendants knew the Class Vehicles and their transmissions suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

356. In failing to disclose the defects with the transmission, Defendants have knowingly concealed materials facts and breached its duty not to do so.

357. Defendants were under a duty to California Plaintiff and the California Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a) Possessed superior and/or exclusive knowledge of the Transmission Defect in Class Vehicles;

b) Made incomplete representations regarding the safety, reliability, durability, and functionality of the transmissions within the Class Vehicles, while purposefully withholding material facts from California Plaintiff and members of the California Sub-Class that contradicted these representations; and/or

c) Intentionally concealed the Transmission Defect from California Plaintiff and members of the California Sub-Class.

358. The facts concealed or not disclosed by Defendants to California Plaintiff and the California Sub-Class Members are material because a reasonable

person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle lurches, hesitates, shudders, makes noises, fails to accelerate and/or loses power are material safety concerns. Had California Plaintiff and the California Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

359.   Defendants continued to conceal the defective nature of the Class Vehicles and their transmissions even after Class Members began to report problems.  Indeed, Defendants continues to cover up and conceal the true nature of the problem.

360.   Defendants' conduct was and is likely to deceive consumers.

361.   Defendants' acts, conduct and practices was unlawful, in that they constituted:

> (a)   Violations of the California Consumers Legal Remedies Act;
>
> (b)   Violations of the Song-Beverly Consumer Warranty Act.

362.   By its conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

363.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

364.   As a direct and proximate result of Defendants' unfair and deceptive practices, California Plaintiff and the California Sub-Class members have suffered and will continue to suffer actual damages.

365.   Defendants have been unjustly enriched and should be required to make restitution to California Plaintiff and the California Sub-Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.

366.   California Plaintiff and the California Sub-Class also seek injunctive relief in compel Defendants to offer, under warranty, remediation solutions that Defendants identify; specifically, to remove and replace the defective transmissions. Plaintiffs further seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class members with a replacement transmission that does not contain the defects alleged herein; and/or compelling Defendants to reform their warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**COUNT X**
**Violation of the Massachusetts Consumer Protection Act**
**Mass. Gen. Laws 93A, § 1, *et seq.***
**(On behalf of the Massachusetts Sub-Class against All Defendants)**

367.   Plaintiff Richard Palermo repeats and re-alleges each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

368.   Plaintiff Richard Palermo ("Massachusetts Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Massachusetts Sub-Class.

369.   Defendants, Massachusetts Plaintiff, and the Massachusetts Sub-Class members are "persons" within the meaning of Mass. Gen. Laws 93A, § 1(a).

370.   Subaru's conduct, as set forth herein, occurred in the conduct of "trade" or "commerce" within the meaning of Mass. Gen. Laws 93A, § 1(b).

371.   The Massachusetts Consumer Protection Act ("MCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws 93A, § 2(a).

372.   Subaru's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the MCPA. Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the MCPA.

373.   Subaru participated in unfair or deceptive trade practices that violated the MCPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable

manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

374. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

375. Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

376. Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

377. Subaru knew or should have known that its conduct violated the MCPA.

378. Defendants were under a duty to Massachusetts Plaintiff and the Massachusetts Sub-Class Members to disclose the defective nature of the Class Vehicles because:

           a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Defendants actively concealed the defective nature of the Class Vehicles from Massachusetts Plaintiff and the Massachusetts Sub-Class Members at the time of sale and thereafter.

379.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

380.   The facts concealed or not disclosed by Defendants to Massachusetts Plaintiff and the Massachusetts Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle lurches, hesitates, shudders, makes noises, fails to accelerate and/or loses power are material safety concerns. Had Massachusetts Plaintiff and the Massachusetts Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

381.   Massachusetts Plaintiff and the Massachusetts Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

382. As a result of Defendants' misconduct, Massachusetts Plaintiff and the Massachusetts Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

383. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Massachusetts Plaintiff and the Massachusetts Sub-Class Members have suffered and will continue to suffer actual damages.

384. Subaru's violations present a continuing risk to Massachusetts Plaintiff and the Massachusetts Sub-Class Members as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest.

385. As Defendants do not maintain a place of business or any assets in the Commonwealth of Massachusetts, Massachusetts Plaintiff and members of the Massachusetts Sub-Class are excused from providing a pre-suit demand to Defendants.

386. Pursuant to Mass. Gen. Laws 93A, § 9, Massachusetts Plaintiff and members of the Massachusetts Sub-Class seek monetary relief against Defendants measures as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for Massachusetts Plaintiff and each member of the Massachusetts Sub-Class. Because Defendants' conduct was committed willfully and knowingly, Massachusetts Plaintiff and members of the Massachusetts Sub-Class are entitled to recover, for Massachusetts Plaintiff and each member of the Massachusetts Sub-Class, up to three times actual damages, but no less than two times actual damages.

**COUNT XI**
**Violation of the North Dakota Consumer Fraud Act**
**N.D. Cent. Code § 51-15-02**
**(On Behalf of the North Dakota Sub-Class against All Defendants)**

387.     Plaintiffs Lori and Shawn Woiwode repeat and re-allege each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

388.     Plaintiffs Lori and Shawn Woiwode ("North Dakota Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the North Dakota Sub-Class.

389.     Defendants, North Dakota Plaintiffs, and the North Dakota Sub-Class members are "persons" within the meaning of N.D. Cent. CODE §51-15-02(4).

390.      Defendants engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. CODE §51-15-02(3), (5).

391.     The North Dakota Consumer Fraud Act ("NDCFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. Cent. CODE §51-15-02.

392.     Subaru's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the NDCFA.

393.     Subaru participated in unfair or deceptive trade practices that violated the NDCFA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable

manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

394.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

395.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

396.   Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

397.   Subaru knew or should have known that its conduct violated the NDCFA.

398.   Defendants were under a duty to North Dakota Plaintiff and the North Dakota Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Defendants actively concealed the defective nature of the Class Vehicles from North Dakota Plaintiff and the North Dakota Sub-Class Members at the time of sale and thereafter.

399.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

400.   The facts concealed or not disclosed by Defendants to North Dakota Plaintiff and the North Dakota Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle lurches, hesitates, shudders, makes noises, fails to accelerate and/or loses power are material safety concerns. Had North Dakota Plaintiff and the North Dakota Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

401.   North Dakota Plaintiff and the North Dakota Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

402.    As a result of Defendants' misconduct, North Dakota Plaintiff and the North Dakota Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

403.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, North Dakota Plaintiff and the North Dakota Sub-Class Members have suffered and will continue to suffer actual damages.

404.    Subaru's violations present a continuing risk to North Dakota Plaintiff and the North Dakota Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

405.    The North Dakota Plaintiffs and the North Dakota Sub-Class Members seek punitive damages against Defendants because their conduct was egregious. Defendants' egregious conduct warrants punitive damages.

406.    Further, Defendants knowingly committed the conduct described above, and thus, under N.D. Cent. CODE §51-15-09, Defendants are liable to the North Dakota Plaintiffs and the North Dakota Sub-Class Members for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.

407.    The foregoing acts, omissions, and practices proximately caused North Dakota Plaintiff and the North Dakota Sub-Class Members to suffer real damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution of value of the vehicles, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

## COUNT XII

### Violation of the New York General Business Law § 349

### N.Y. Gen. Bus. Law § 349

### (On Behalf of the New York Sub-Class against All Defendants)

408.   Plaintiff Carolyn Patol repeats and re-alleges each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

409.   Plaintiff Carolyn Patol ("New York Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the New York Sub-Class.

410.   Subaru is a "person," "firm," "corporation," or "association" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349.

411.   New York Plaintiff and the New York Sub-Class members are "persons" within the meaning of N.Y. Gen Bus. Law § 349.

412.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Subaru's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Subaru's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, New York Plaintiff and the New York Sub-Class Members suffered injury as a result of the deceptive acts or practice.   Defendants engaged in unlawful deceptive act and/or practices that violated the New York GBL.

413.   Subaru's actions, as set forth above, occurred in the conduct of business, trade or commerce.

414.   Subaru participated in unfair or deceptive practices that violated the New York GBL as described below and alleged throughout the Complaint.  By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

415.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

416.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

417.   Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

418.   Subaru knew or should have known that its conduct violated the New York CFA.

419.   Defendants were under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c)  Defendants actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

420.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

421.   The facts concealed or not disclosed by Defendants to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle lurches, hesitates, shudders, makes noises, fails to accelerate and/or loses power are material safety concerns. Had New York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

422.   New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

423.   As a result of Defendants' misconduct, New York Plaintiffs and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

424.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

425.   Subaru's violations present a continuing risk to New York Plaintiff and the New York Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Subaru's deceptive practices are in the hundreds of thousands nation-wide; (2) Subaru has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective transmission, the likelihood of continued impact on other consumers is significant.

426.   Pursuant to N.Y. Gen. Bus. Law § 349(h), New York Plaintiff and each New York Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendants' willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New

York Class members also seek attorneys' fees, an order enjoining Subaru's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT XIII
### Violation of the New York General Business Law § 350
### N.Y. Gen. Bus. Law § 350
### (On Behalf of the New York Sub-Class against All Defendants)

427.   New York Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

428.   New York Plaintiff brings this cause of action on her own behalf and on behalf of the members of the New York Sub-Class against all Defendants.

429.   New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

430.   Subaru caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including New York Plaintiffs and the New York Sub-Class Members.

431.   Subaru violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, Subaru's failure to disclose

the Transmission Defect, by concealing the Transmission Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defect in the course of its business.

432.   In purchasing or leasing the Class Vehicles, New York Plaintiff and the New York Sub-Class Members were deceived by Subaru's failure to disclose the Defect.

433.   New York Plaintiffs and the New York Sub-Class Members had no way of knowing that Subaru's representations and omissions were false and misleading, that an internal component part of the Class Vehicles is defective and causes a safety hazard, that the transmissions will fail under normal and intended use of the Class Vehicles, or that Subaru would refuse to repair, replace, or compensate New York Plaintiffs and the New York Sub-Class Members for the failure of the defective transmissions and the known consequences of that failure to the Class Vehicles.

434. Subaru's   unfair   or   deceptive   acts   or   practices,   fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

435.   Subaru intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead New York Plaintiffs and the New York Sub-Class Members.

436.   Subaru knew or should have known that its conduct violated the NY FAA.

437.   New York Plaintiffs and the New York Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

438.   Had New York Plaintiffs and the New York Sub-Class Members known that the Class Vehicles would exhibit the Transmission Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

439.   Defendants were under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c)  Defendants actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

440. New York Plaintiff and the New York Sub-Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Subaru's conduct in that they overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Subaru's misrepresentations, fraud, deceptive practices, and omissions.

441. New York Plaintiff and the New York Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because Subaru acted willfully or knowingly, New York Plaintiff and the New York Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

## COUNT XIV
**Violation of the Virginia Consumer Protection Act**
**Va. Code Ann. § 59.1-200(A),** *et seq.*
**(On behalf of the Virginia Sub-Class against All Defendants)**

442. Plaintiffs Cassandra and Steven Sember repeat and re-allege each and every allegation contained in paragraphs 1 through 214 above as if fully set forth herein.

443. Plaintiffs Cassandra and Steven Sember ("Virginia Plaintiff") bring this cause of action on their own behalf and on behalf of the members of the Virginia Sub-Class.

444. Defendants, Virginia Plaintiffs, and the Virginia Sub-Class members are "persons" within the meaning of Va. Code Ann. § 59.1-198.

445.    The sale or lease of the Class Vehicles by Virginia Plaintiffs and members of the Virginia Sub-Class were for personal, family or household purposes and are "consumer transaction[s]" as defined by Va. Code Ann. § 59.1-198.

446.    The Class Vehicles are "goods" as defined by Va. Code Ann. § 59.1-198.

447.    Defendants are "suppliers" as defined by Va. Code Ann. § 59.1-198.

448.    Defendants violated the Virginia Consumer Protection Act ("VCPA"), Va. Code Ann. § 59.1-200(A), by inter alia: (1) "[m]isrepresenting that the Class Vehicles have certain quantities, characteristics, ingredients, uses, or benefits;" (2) "[m]isrepresenting that the goods or services are of a particular standard, quality, grade, style, or model;" (3) "[a]dvertising goods or services with the intent not to sell them as advertised;" and (4) "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

449.    Subaru's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the VCPA. Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the VCPA.

450.    Subaru participated in unfair or deceptive trade practices that violated the VCPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented

and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

451. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

452. Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

453. Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

454. Subaru knew or should have known that its conduct violated the VCPA.

455. Defendants were under a duty to Virginia Plaintiff and the Virginia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Defendants actively concealed the defective nature of the Class Vehicles from Virginia Plaintiff and the Virginia Sub-Class Members at the time of sale and thereafter.

456.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

457.    The facts concealed or not disclosed by Defendants to Virginia Plaintiff and the Virginia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle lurches, hesitates, shudders, makes noises, fails to accelerate and/or loses power are material safety concerns. Had Virginia Plaintiff and the Virginia Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

458.    Virginia Plaintiff and the Virginia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defect. That is the reasonable and objective consumer expectation for vehicles.

459.    As a result of Defendants' misconduct, Virginia Plaintiff and the Virginia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

460.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Virginia Plaintiff and the Virginia Sub-Class Members have suffered and will continue to suffer actual damages.

461.   Subaru's violations present a continuing risk to Virginia Plaintiff and the Virginia Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

462.   Virginia Plaintiffs and members of the Virginia Sub-Class seek actual damages against Defendants in an amount to be determined at trial and/or statutory damages pursuant to the VCPA based on Defendants' wanton and willful conduct, costs, attorneys' fees, restitution, disgorgement of funds, and any other just and proper relief available under the VCPA. See Va. Code § 59.1-204.

463.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs, the Class and all Sub-Classes, and award the following relief:

A. A declaration that Subaru is financially responsible for notifying all Class Members of the Transmission Defect;

B. An order enjoining Subaru from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Subaru to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Subaru to repair and eliminate the Transmission Defect from every Class Vehicle; enjoining Subaru from selling the Class Vehicles with the misleading information; and/or compelling Subaru to reform its warranty, in a manner deemed to be appropriate by the Court,

to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

C.  Damages and restitution in an amount to be proven at trial;

D.  An order certifying the proposed Class and Sub-Classes, designating Plaintiffs named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

E.  A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

F.  Any and all remedies provided pursuant to the express and implied warranty laws, common law fraud by concealment laws, and consumer protection statutes alleged herein;

G.  An award to Plaintiffs and the Class and Sub-Classes of compensatory, exemplary, and statutory damages as applicable, including interest, in an amount to be proven at trial;

H.  A declaration that Defendants must disgorge, for the benefit of the Class and Sub-Classes, all or part of the ill-gotten profits it received from the sale or lease of Class Vehicles, and/or make full restitution to Plaintiffs and Class Members;

I.  An award of attorneys' fees and costs, as allowed by law;

J.  An award of pre-judgment and post-judgment interest, as provided by law;

K.  Leave to amend the Complaint to conform to the evidence produced at trial; and

L.  Such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated: May 14, 2021                    BERGER MONTAGUE PC


/s/ Russell D. Paul
Russell D. Paul (NJ 037411989)
Amey J. Park (NJ 070422014)
Abigail J. Gertner (NJ 019632003)
Natalie Lesser (NJ 017882010)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:   (215) 875-3000
Fax:   (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net
nlesser@bm.net


*Counsel for Plaintiffs and the Proposed Classes*